## LEISER v. THOMAS et al.*
### No. 14489.

Court of Appeal of Louisiana. Orleans.

Oct. 16, 1933.

Prowell, McBride & Ray, of New Orleans, and Welton P. Mouton, of Lafayette, for appellant.

Eugene S. Hayford and Gordon Boswell, both of New Orleans, for appellees.

HIGGINS, Judge.

This is a suit by a guest against the owner of an automobile and his insurance carrier, in solido, under Act No. 55 of 1930, for damages for alleged personal injuries sustained and medical expenses incurred, as a result of

the defendant's car overturning on the public highway while en route from New Orleans, La., to Bay St. Louis, Miss., on July 27, 1932, at 2 p. m. o'clock. The charge of negligence against defendant Thomas, the owner and driver of the car, is that he unlawfully and negligently drove his 12-cylinder Cadillac sedan at the rate of speed of 85 miles per hour on a loose gravel highway.

The defendants answered, denying that Thomas was operating the car at an excessive rate of speed, and averred that the accident was unavoidable, as the car suddenly skidded despite his efforts to control it; and in the alternative specially pleaded contributory negligence.

There was judgment dismissing the plaintiff's suit on the ground of contributory negligence, and she has appealed.

The record shows that the plaintiff is a married woman, age 27 years, and the defendant is a married man, age 34 years; that she had lived with him as his mistress for one year, but for about 2 months prior to the accident they had discontinued their relation, and she returned home to live with her mother on Frenchmen street in New Orleans; that Thomas is a part owner of Club Forest, a night club, which operates a restaurant and also games of chance; that he owned a new 12-cylinder Cadillac sedan; that on Sunday, July 26, 1932, he learned that plaintiff had reserved a table at his club restaurant for Monday night, and he phoned plaintiff at 5 a. m. Monday morning at her mother's home in order to make an appointment with her,. so as to persuade her not to go to the club Monday night because his wife would be there; that she reluctantly permitted him to call at her home; that he arrived there about 6 a. m. and requested her to go to breakfast with him, as he had something important to tell her; that they went to a restaurant on Canal boulevard, where they had something to eat and drank "several highballs made with gin," which he had brought with him; that he then made known the purpose of his visit, and she declined to stay away from the club that night, having previously made an engagement with another man to go there for dinner; that they rode around the St. Charles Belt, with her driving, and stopped at the apartment on Carrollton avenue where he had previously lived with her; that he wanted to go inside, but she declined, and gave as the excuse that she did not have the key; that they remained in front of the place about one-half hour, and, after driving around New Orleans a while, went back to the restaurant on Canal boulevard, where they ate sandwiches and drank more highballs; that they then left about 11 a. m., he agreeing to drive her home, but, instead of turning into Frenchmen street, where she lived, he continued on out Gentilly avenue, saying he was going to take a ride; that they crossed the Pontchartrain bridge, and later stopped at the Y, the intersection of the roads going north to Picayune and east to Bay St. Louis, Miss., and ordered Coca-Cola at Crow's Place and went to the dressing rooms; that he continued in his efforts to prevail upon her not to go to the club, and she consistently refused to stay away; that she requested him to take her home, and he agreed to do so, but instead started towards Bay St. Louis; that from "Crow's Place" at the Y to Carver's garage, where the accident occurred, is about 3 miles, the first 2 miles of the highway being under construction with "black top" and the remaining mile being a gravelled road about 18 or 20 feet wide with loose gravel on it; that he was driving very fast, admittedly between 60 and 70 miles per hour, and, according to her statement, about 85 miles per hour; that there is a long gradual curve on the New Orleans side of Carver's garage with the apex of the curve to the left going from the city; that at that time there was a parked road scraper and an automobile on Thomas' right side of the road, leaving enough room, however, for an automobile to pass to the left of them; that, as Thomas was coming out of the turn and passing these parked machines, he encountered loose gravel, and the rear wheels skidded to the one-foot dirt shoulder of the road and then into the ditch adjacent to the road, the front wheels remaining on the road, and the heavy car then turned over sideways about five times, coming to rest in a ditch on the left side of the road about 100 feet from where it left the road; that the plaintiff and Thomas were thrown clear of the car and both severely hurt; and that they were removed to the hospital at Picayune, Miss., and the next day to hospital in New Orleans.

■ The first question presented is, Was the defendant Thomas guilty of negligence?

The accident occurred during the daytime, the weather was clear, and there was nothing to intercept his view of the road. The presence of the road-scraping machine and the auto parked on his right side of the road was obvious. It was apparent that there was loose gravel on the highway. Thomas admittedly drove around the long gradual curve and attempted to pass the two parked machines at a rate of speed of between 60 and 70 miles per hour without making any effort to slow down. The highway was only 18 or 20 feet wide, and the presence of the two machines had the effect of making the road narrower as far as Thomas was concerned. Under the circumstances, we experience little difficulty in reaching the conclusion that Thomas was guilty of recklessness and negligence. Davis v. Shaw (La. App.) 142 So. 301; Marquez v. LeBlanc (La. App.) 143 So. 108–111; Richard v. Roquevert (La. App.) 148 So. 92.

■ The plea of contributory negligence is predicated upon two grounds: First, that the plaintiff and defendant were on a pleasure trip under the influence of liquor, which caused her to interfere with the driver by showing him amorous attention; and, second, that the plaintiff failed to warn Thomas of the danger, or protest against the manner in which he was driving.

Thomas and plaintiff admit taking several "gin highballs" in the morning when they ate breakfast and lunch at the restaurant on Canal boulevard, but their testimony coincides on the point that they did not take another drink after 11 a. m., and that they were not drunk or intoxicated, and that they were fully in possession of their faculties. Carver and Jones, two witnesses for defendants, who assisted the injured parties to get medical attention, state that they did not observe that plaintiff and Thomas were drunk, but say they found two pints of gin in the car after the accident. Mitchel, another witness for defendant, testified that plaintiff and Thomas smelled strongly of the odor of liquor after the accident; but Jones and Carver, who were also present, refused to corroborate Mitchel.

The fact that Thomas drove through the streets of the city of New Orleans, over the bridges and around the curve of the highway from the city to the point of the trouble, a distance of over 50 miles, without mishap, also tends to show he was not intoxicated and was capable of managing the automobile.

It is not suggested that there is any collusion between plaintiff and Thomas to mulct the insurance carrier in damages. On the contrary, the record shows that he has spiritedly opposed her. Therefore it seems clear to us that the preponderance of the evidence on the issue of intoxication and inability to manage the car is with the plaintiff.

■ Did the plaintiff warn Thomas of the danger and protest against his reckless driving? The answer to this question depends on the testimony of the two occupants of the car.

The illicit relations of the plaintiff and Thomas is said to affect her credibility. If this be so, then, by parity of reasoning, his credibility is equally affected. Therefore we shall have to consider all the circumstances of the case to determine whose testimony is entitled to greater credence.

Thomas, on direct examination, first said she did not complain of the manner in which he was driving. On cross-examination he first said if she had warned him, or protested, he would have remembered that fact, but that he did not recall that she did so. Finally he was asked: "Q. Would you deny that she called your attention to that curve in the road? A. I don't think so, but I wouldn't deny it."

Plaintiff testified that, before leaving "Crow's Place," at the Y, Thomas promised to take her home, but instead began to drive toward Bay St. Louis, that he then began to drive very fast, and she warned him that the road was dangerous on account of loose gravel, but he kept on going faster until he reached 85 miles per hour by the speedometer, and that she also called his attention to the curve in the road.

It is a natural instinct of human beings, and particularly women, to shrink from an obvious danger. The situation with which the plaintiff was confronted was fraught with destruction and havoc. The law of self-preservation would prompt one, under such circumstances, to protest. It was the logical, sensible, and natural thing to do.

Furthermore, plaintiff gives a clear and coherent story of what happened up to the time she was knocked unconscious. On the other hand, Thomas' memory was very faulty. She is positive, he is uncertain. It has been held that this is a reason to give greater weight to the testimony of one witness than another's. Bottazzi v. American Union Fire Ins. Co., 14 Orleans App. 245; Stevens v. Yellow Cab Co., Inc. (La. App.) 142 So. 807.

Again, Thomas, in his sworn answer, denies that he was driving at an excessive rate of speed, and avers he was traveling at the usual speed of cars using this highway. In his testimony he admits he was driving between 60 and 70 miles per hour. We consider this a contradiction; that it affects his credibility.

The defendants also sought to show by the testimony of the witness Mitchel that plaintiff was either "loving up" or "squabbling" with Thomas just prior to and at the time of the accident. Mitchel was over a quarter of a mile from the scene of the accident when it occurred. He was driving another car about 35 or 40 miles per hour in the rear of the Cadillac, going in the same direction, and, as it was dusty, we are quite certain that he did not see what was going on between the parties in the front seat of the Cadillac sedan at the time of the accident. But, if he did see them in an attitude of what appeared to be either love making, or fussing, it is not unlikely at all that she was cringing with fear in the presence of imminent danger of loss of life or serious injury, as she testified.

■ Finally, the defendants had the burden of establishing the special defense of contributory negligence by a preponderance of the evidence, and we feel that they have failed to do so.

It is our opinion that defendants are liable.

As to the quantum, the undisputed evidence shows that plaintiff suffered a long, horseshoe-shape wound in the scalp on the left side of her head, necessitating sixteen sutures. The laceration has healed and the scar is hidden by plaintiff's hair, except by her left ear, where a part of it is visible if plaintiff dresses her hair on top of her head. She also sustained a severe cerebral contusion and a probable fracture of the base of the skull. There were also contusions and bruises over the greater portion of her body. She was in a critical condition for several days, and she remained in bed at Hotel Dieu for 45 days. These injuries were serious and painful, but she has apparently recovered from the effect of them.

There was also a compressed fracture of the eleventh dorsal vertebra of a crushing nature that caused a protrusion of the spine at that point. This injury was treated by placing her on her back on a Bradford frame, where she had to lie for 4 weeks. A plaster of paris jacket covering the entire trunk of her body, from the chest to her hips, was then applied, and was permitted to remain on her for 4 weeks. Up to the time of the trial she wore a back brace made of steel and cloth, which is uncomfortable. While the doctors thought it was possible for her to develop a hump in her back, it was their opinion that there was nothing in her condition to indicate that it was probable. We conclude that the injury to her back was severe and painful, but is not permanent.

The hospital, nurses', and doctors' bills, amounting to $1,706, were not contested, and therefore are allowed. Without attempting to itemize the damages, we have decided to allow plaintiff the sum of $5,000.

For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of Mrs. Mary Myrtle Leiser, wife of Meyer Blackman, and against the defendants, Willis Clement Thomas and the American Automobile Insurance Company, in solido, for the sum of $5,000, with legal interest thereon from judicial demand until paid; defendants to pay all costs of court.

Judgment reversed.

JANVIER, Judge (dissenting).

I fully appreciate the futility of dissenting in a matter involving only a question of fact, but, after mature deliberation, I have reached the conclusion that I cannot concur in a decree which appears to me erroneous and which reverses a judgment which, I believe, to be not only not manifestly incorrect, but, in fact, fully justified by the evidence.

Even if it be conceded that the defendant Thomas, who was driving the automobile, had taken no drinks after about 11 a. m., still we find that between 8 a. m. and 11 a. m. he had consumed at least one-half of one-fifth of a gallon of gin and probably more than one-half, since plaintiff states that only she and defendant drank, and that she, herself, took only two or three drinks.

In order for defendants to prevail, it is not necessary that it be shown that Thomas was so drunk that he could not operate an automobile. All that is required is that it be shown that to the knowledge of plaintiff he had imbibed sufficiently of liquor to make it appear that he could not drive with reasonable safety.

I am well convinced that no man can imbibe as much liquor as defendant drank and drive with reasonable safety.

Now plaintiff knew exactly defendant's condition, since she was with him during the entire preceding part of the day. Therefore, conceding that he took no liquor after leaving New Orleans, and this is a violent concession to make, since on the trip from New Orleans to the point of the accident the automobile stopped several times and the occupants took cold drinks, and since they admittedly had in the car with them two other bottles of liquor—still, even conceding that defendant drank no more liquor, he had, at 11 a. m., already imbibed more than any man can contain without losing his ability to drive with caution and prudence.

I place no credence whatever in plaintiff's story that she had been practically forced by defendant to accompany him on the trip. It is possible that she was reluctant to join him, but that she was under coercion which overcame her ability to resist is impossible to believe. She first joined him early in the morning and had remained with him for some seven or eight hours. During that time they drove around the city for about five hours, stopping many times and at various places, at any one of which she could have left him. After leaving the city, they stopped at several filling stations, and after each stop she continued to ride with him. Of course, her explanation is that after each stop he (Thomas) promised to turn around and return her to her home, but her continued and repeated acquiescence in riding with him makes it impossible for her story to be believed when she says that it was beyond her power to leave him. She was not a young and inexperienced girl. She was a matured woman with many years' experience in the ways of men, and I refuse to place any credence in her story.

My associates feel that, since the car had gone as far as about fifty miles before the accident took place, it is conclusively shown that defendant could operate it with reasonable safety. I think that there was merely considerable good luck involved up to that point. Many intoxicated drivers manage miraculously to escape accidents, but that fact does not prove that an intoxicated driver is able to operate a car prudently.

In my conclusions I am in accord with the judgment of the district judge who saw the witnesses and heard what they said.

If a man and his mistress embark upon a drinking expedition, and afterwards start out on an automobile ride, the car being driven by one of them, there should be no recovery by the other if an accident results from the fact that the one who is driving is manifestly unable to do so with reasonable safety.

I believe that the findings of the district judge were quite correct, and therefore from the majority decree I respectfully dissent.